**Paula L. SAYRE, Plaintiff,**

v.

**GENERAL NUTRITION CORPORATION, et al., Defendants.**

Civ. A. No. 2:92–0444.

United States District Court, S.D. West Virginia, Charleston Division.

Nov. 16, 1994.

James B. Lees, Jr., Hunt, Lees, Farrell & Kessler, Charleston, WV, for plaintiff.

Fazal A. Shere, P. Michael Pleska, Bowles, Rice, McDavid, Graff & Love, Arden J. Curry, II, Pauley, Curry, Sturgeon & Vanderford, Charleston, WV, Richard W. Hulbert, Cleary, Gottlieb, Steen & Hamilton, New York City, Richard deC. Hinds, Sara D. Schotland, Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton, Washington, DC for defendants.

*MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

Pending before the Court is the Defendants' motion for summary judgement contending the Plaintiff's claim is time-barred by the two-year statute of limitations embodied in W.Va.Code § 55–2–12(b). For reasons that follow, the Defendants' motion is

**GRANTED.** Oral argument is unnecessary and the motion for such is **DENIED.**

## I

■ A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The standard used to determine whether a motion for summary judgment should be granted or denied was stated recently by our Court of Appeals:

A moving party is entitled to summary judgment "if the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

*Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). *Accord Riffe v. Magushi,* 859 F.Supp. 220, 222, n. 1 (S.D.W.Va.1994); *Cornell v. General Electric Plastics,* 853 F.Supp. 221, 225–26 (S.D.W.Va. 1994); *Thomas v. Shoney's, Inc.,* 845 F.Supp. 388, 389–90 (S.D.W.Va.1994) (Haden, C.J.).

## II

The facts are undisputed. In 1983, on the recommendation of a friend, the Plaintiff began taking L-tryptophan to help her sleep. She bought her last bottle of L-tryptophan in November 1989. After she moved to Ohio in 1985, the Plaintiff bought L-tryptophan products from a General Nutrition Center store in Vienna, West Virginia, retail stores in West Virginia and Ohio owned by Rite–Aid and Revco, Swisher & Loshe Pharmacy in Pomeroy, Ohio, and The Farmacy in Athens, Ohio.

Prior to November 1989, the Plaintiff had been experiencing significant health problems including choking, a burning sensation in her spine, and extreme pain in her hips. On November 13, 1989, the Plaintiff saw a NBC Nightly News television report covering a federal investigation of an outbreak of a new illness, later called eosinophilia myalgia syndrome (EMS), which had been linked to L-tryptophan by the Centers for Disease Control and the Food and Drug Administration.[1] The NBC report also stated that fed-

---

1. In 1993, the Food and Drug Administration reported

EMS is a systemic connective tissue disease characterized by eosinophilia (an increase in one type of the white blood cells), myalgia (severe muscle pain), and cutaneous (skin) and neuromuscular manifestations. This illness, which occurred in epidemic fashion in the United States in the summer and fall of 1989, is associated with the use of dietary supplements containing L-tryptophan. To date, more than 1,500 cases, including 38 deaths, have met the Centers for Disease Control (CDC)

case surveillance definition of the disease, although the true incidence of the disorder is thought to be much higher.

FDA first learned about problems with L-tryptophan in 1989, following a report from New Mexico about four cases of an illness manifested by myalgia and eosinophilia, in which the common denominator appeared to be the use of L-tryptophan. FDA subsequently issued a strong public warning on November 11, 1989, to discontinue the use of L-tryptophan. On November 17, 1989, in conjunction with CDC, FDA requested a nationwide recall of all over-

eral health officials had warned that the "risks of taking L–Tryptophane far outweigh any benefits. They are urging that stores stop selling it, and that if people have any at home they stop using it." [2]

After viewing the report, the Plaintiff wrote on November 14, 1989 to Dr. Huntwork, a rheumatologist who had treated her previously. She wrote "I have been taking L–Tryptophane 500 mg to help me sleep, but I heard on television last night it causes some disease effecting (sic) the muscles. Do you know anything about this?" The Plaintiff gave the letter to Dr. Huntwork but never questioned him on her self-prescribed use of L-tryptophan. The Plaintiff concluded L-tryptophan was not the cause of her medical problems and continued to take L-tryptophan until her supply was exhausted.

In May, 1990, the Plaintiff read a magazine article on the problems L-tryptophan was causing. Then she wrote three other treating physicians, again questioning the possibility of a link between her symptoms and L-tryptophan. The first medical diagnosis giv-

en Plaintiff that L-tryptophan was the source of her problems was made on April 20, 1993 by Dr. Virginia Stein to Mrs. Sayre.

The Plaintiff consulted an attorney in February 1992 and filed this action on May 15, 1992. Her case and claim was transferred for discovery and related pretrial matters to the District of South Carolina by the Panel on Multidistrict Litigation (MDL Panel) on July 23, 1992. On September 18, 1992, the case was removed from the active docket of this Court pending action in the District of South Carolina. The case was returned to this Court by the MDL Panel on March 16, 1994 and reopened here on May 3, 1994.

### III

■ Here, Defendants moved for summary judgment, arguing Plaintiff's claim is time-barred by the statute of limitations. Under the discovery rule, Defendants contend the Plaintiff should have discovered the connection between her symptoms and her self-prescribed use of L-tryptophan when she first viewed the NBC news report. On the

the-counter dietary supplements containing 100 mg or more of L-tryptophan. The agency also issued an Import Alert to detain all foreign shipments of L-tryptophan. On March 22, 1990, the recall was extended to all marketed products containing added manufactured L-tryptophan because of a case of EMS in a patient consuming less than 100 mg daily.... The net effect of the recall and import alert was a ban on the oral supplement forms of L-tryptophan because virtually all of the raw material used to formulate U.S. products was imported.

Regulation of Dietary Supplements, 58 Fed.Reg. 33,690, 33,696 (1993) (references omitted).

2. Because of the importance of the explicitness and unique urgency of the warning which NBC reported to the analysis of this case, the entire report is reproduced for context:

Tom Brokaw, anchor: Tonight U.S. health officials are investigating reports that a widely used diet supplement may cause a deadly blood disease. It has struck people in at least nine states. The most serious outbreak, in New Mexico. NBC's science correspondent Robert Bazell.

Robert Bazell reporting: In health food stores around the country today workers were either removing L-Tryptophane from the shelves or posting warnings. Physicians believe they have discovered an outbreak of a serious new illness among people who have taken the commonly-used food supplement.

Joy Hunter: I started out with a, actually just a headache, and it's just progressed to the point where I'm really quite tired now.

Bazell: Joy Hunter has the illness. The symptoms include a high count of a certain type of white blood cell, severe muscle pain, coughing, and rashes. There have been no confirmed deaths, but doctors say the illness could be life threatening. There have been 50 confirmed cases, but at state health departments across the country and at the Centers for Disease Control, reports of new cases were pouring in today. And officials believe there are hundreds and probably thousands.

L–Tryptophane is a natural substance in the body. People take it in large doses to help go to sleep or to help relieve premenstrual syndrome. Both the Centers for Disease Control and the Food and Drug Administration are investigating. So far, the investigation has found that almost everyone with the illness has taken L-Tryptophane, usually in high doses. But there is no single brand or manufacturer that seems to be responsible.

Federal health officials say that until they figure out what is causing the illness, the risks of taking L-Tryptophane far outweigh any benefits. They are urging that stores stop selling it, and that if people have any at home they stop using it. Robert Bazell, NBC News, New York.

*NBC Nightly News* (NBC television broadcast, Nov. 13, 1989).

other hand, Plaintiff contends she did not discover the connection until May 1990, when she read the magazine article on L-tryptophan or until April 1990, when her symptoms were diagnosed as EMS. Despite its strong concerns against discouraging people from seeking proper medical diagnosis and treatment, the Court holds Plaintiff reasonably should have discovered the connection between her symptoms and L-tryptophan in November 1989 when she was so informed by the NBC telecast.

The Court exercises its diversity jurisdiction in this case. 28 U.S.C. § 1332. The parties agree the two-year statute of limitations provided by W.Va.Code § 55–2–12(b) applies, as well as the discovery rule developed for product liability cases by the Supreme Court of Appeals of West Virginia in *Hickman v. Grover,* 178 W.Va. 249, 358 S.E.2d 810 (1987). *See Cecil v. Airco, Inc.,* 187 W.Va. 190, 416 S.E.2d 728 (1992) (per curiam). However, the specific product liability discovery rule of *Hickman* has been subsumed within the general discovery rule developed by the Court in *Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992).

In *Cart,* the West Virginia Court ended its practice of extending the discovery rule on a case-by-case to new factual scenarios. Instead, the Court developed a discovery rule generally applicable to all torts[3] stating "a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs; under the 'discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim." *Syl. pt. 1, Cart,* 188 W.Va. 241, 423 S.E.2d 644 (1992). However, the Court cautioned

> [t]he 'discovery rule,' then, is to be applied with great circumspection on a case-by-case basis only where there is a strong showing by the plaintiff that he was *prevented* from knowing of the claim at the time of the injury. The general rule is

that mere ignorance of the existence of a cause of action or of the identity of the wrongdoer does not prevent the running of the statute of limitations. In order to benefit from the rule, a plaintiff must make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship.

188 W.Va. at 245, 423 S.E.2d at 648 (emphasis in original) (footnotes omitted).[4]

After developing the generally applicable discovery rule in *Cart,* West Virginia's highest court acknowledged the second prong of the general rule would include the specific rule the Court had previously created for product liability cases. The Court opined "[i]n the products liability area, lack of comprehension of injury includes (1) that the plaintiff has been injured, (2) the identity of the maker of the product, and (3) that the product has a causal relation to the injury." *Cart,* 188 W.Va. at 245, 423 S.E.2d at 648, n. 14 (quoting *Syl. pt. 1, Hickman v. Grover,* 178 W.Va. 249, 358 S.E.2d 810 (1987)). Thus, the *Hickman* product liability discovery rule was incorporated into the second prong of the *Cart* test.

The first and third prongs of the general discovery rule are inapplicable to this case. There is no allegation of fraudulent concealment by the Defendants nor is this a situation showing an extreme hardship sufficient to activate the discovery rule. Only the second element of the general rule is applicable in this case: whether the Plaintiff was unable to comprehend her injury.

As noted, applying the second prong of the general discovery rule in a product liability case requires the analysis of the factors set forth in *Hickman v. Grover:* "[T]he statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) the identity of the maker of the

---

3. "The 'discovery rule' is generally applicable to all torts, unless there is a clear statutory prohibition of its application." *Syl. pt. 2, Cart v. Marcum,* 188 W.Va. 241, 423 S.E.2d 644 (1992).

4. The Court also cautioned that "by declaring the *existence* of a 'discovery rule' we do not eviscerate the statute of limitations: the statute of limi-

tations will apply unless the handicaps to discovery at the time of injury are great and are largely the product of the *defendant's* conduct in concealing either the tort or the wrongdoer's identity." *Cart,* 188 W.Va. at 245, 423 S.E.2d at 648 (emphasis in original).

product, and (3) that the product had a causal relation to his injury." 178 W.Va. at 252, 358 S.E.2d at 813. In this case, the Plaintiff has not disputed she knew she was injured or that she knew the identity of the Defendants as marketers of L-tryptophan. Only the third aspect of the *Hickman* test is in dispute. The question remaining, then, is when did the Plaintiff know, or by the exercise of reasonable diligence should have known, L-tryptophan had a "causal relation to [her] injury." The Court concludes that the plaintiff, by the exercise of reasonable diligence, should have known that L-tryptophan had a causal relation to her injury when she saw the warning reported by NBC on November 13, 1989.

In concluding that the Plaintiff should have known of the connection between L-tryptophan and her medical condition in November, 1989, the Court does not imply that a medical diagnosis is never required for the statute of limitations to run under the discovery rule. The urgent and complete notice the Plaintiff received, however, weighs against the strong countervailing concern to require a separate medical diagnosis. Here, the Plaintiff was not following a physician's direction when she chose to self-administer L-tryptophan or a prescription as she continued to take L-tryptophan after seeing the urgent and strongly-worded warning. Rather, she alone decided to ingest L-tryptophan to alleviate her sleeping problems. No doctor-patient relationship was established with respect to the L-tryptophan. She self-prescribed her use and, as such, the decision whether to continue taking L-tryptophan was hers, based on what she knew about the drug. The news telecast warning was too strong for this Court to ignore. As the Supreme Court of Appeals of West Virginia noted in *Slack v. Kanawha County Housing*, 188 W.Va. 144, 150, 423 S.E.2d 547, 553 (1992) (quoting *Spitler v. Dean*, 148 Wis.2d 630, 638, 436 N.W.2d 308, 311 (1989)): "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach."[5]

## IV

The Defendants' motion for summary judgment is **GRANTED**. The plaintiff should have known of the causal connection between her self-prescribed L-tryptophan use and her medical condition in November, 1989. The Plaintiff's claim is time-barred by application of the two-year statute of limitations provided in W.Va.Code § 55–2–12(b). The case is **DISMISSED** and stricken from the docket of this Court.

The Clerk is directed to send a copy of this Order to counsel of record.

---

5. For a similar case and result *see Townley v. Norfolk & Western Ry. Co.*, 887 F.2d 498 (4th Cir.1989). In *Townley*, our Court of Appeals held that the statute of limitations began to run under the discovery rule when Townley read a notice encouraging railroad workers to apply for black lung benefits and he began a series of correspondence seeking information to apply for black lung benefits. The Court of Appeals held that

> [a]lthough Townley claims he was not aware he suffered from black lung until his condition

was diagnosed in 1984, his own testimony reveals that in 1980 his condition had manifested itself to such an extent that he began corresponding with the railroad in an attempt to obtain the necessary information to apply for black lung benefits.... Even if Townley truly did not believe he had black lung in 1980, it is obvious from his actions that he possessed sufficient information that he knew, or should have known, that he had been injured by his work with the railroad.

*Id.* at 501.