**CARBON FUEL COMPANY, Plaintiff,**

v.

**USX CORPORATION, et al., Defendants, Third–Party Plaintiffs, and Counterclaimants.**

Civ. A. No. 2:93–1073.

United States District Court, S.D. West Virginia, Charleston Division.

July 5, 1995.

James K. Brown, Jackson & Kelly, Charleston, WV, Larry L. Roller, Chesapeake, WV, for Carbon Fuel Co., a corporation.

Charles L. Woody, Paula Durst Gillis, Spilman, Thomas & Battle, Charleston, WV, J. Michael Jarboe, Jared Meyer, USX Corp., Law Dept., Pittsburgh, PA, for USX Corp., a corporation, and U.S. Steel Mining Co., Inc., a corporation.

Robert B. King, Stephen B. Farmer, King, Allen & Arnold, Charleston, WV, Anthony J. Polito, Polito & Smock, Pittsburgh, PA, for Consolidation Coal Co.

E. Forrest Jones, Jr., Albertson & Jones, Charleston, WV, Gregory B. Robertson, Matthew J. Calvert, Hunton & Williams, Richmond, VA, John A. Lucas, Hunton & Williams, Knoxville, TN, for Arch Mineral Corp., Arch Minerals of Kentucky, Old Ben Coal Co.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are eight motions for summary judgment.[1] Defendants USX Corporation and U.S. Steel Mining Co. (collectively "USX") filed four motions for summary judgment.[2] Plaintiff Carbon Fuel Co. ("Carbon Fuel"), and Third–Party Defendants Consolidation Coal Co. ("Consol"), Old Ben Coal Co. ("Old Ben"), and Arch Mineral Corp. and Arch of Kentucky (collectively "Arch") have each filed one motion for summary judgment. For reasons set forth below, the motion of USX against Carbon Fuel is **GRANTED**. Further, the motions of Arch, Consol, and Old Ben against USX are also **GRANTED**. The remaining motions for summary judgment are **DENIED**. This case is **DISMISSED** from the docket of the Court.

This complicated dispute centers on the application of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), Pub.L. No. 102–486, § 9701 et seq., 106 Stat. 2776, 3036–3056, codified at 26 U.S.C. § 9701 et seq., to several sales of mines and mining operations among the parties. The controversy concerns how the Coal Act affects certain health benefit funding provisions in the settlement agreements executed as required by the National Bituminous Coal Wage Agreement (NBCWA) in effect at the time of each sale. This case also concerns how the Coal Act affects indemnity provisions appearing in each settlement agreement. The issues are matters of first impression.[3]

## I

A principal purpose of summary judgment is to isolate and dispose of meritless litigation. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The standard used to determine whether a motion for summary judgment should be granted or denied was stated recently by our Court of Appeals:

> A moving party is entitled to summary judgment "if the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). See Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir.1979).

> A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d

1. Several other motions are also pending. Arch, Consol, and Old Ben have filed three motions for entry of default judgment against USX for USX's failure to file replies to the Third–Party Defendants' counterclaims. USX has moved to set aside the Clerk's entry of default against it and for reconsideration of the Court's Memorandum Opinion and Order of April 24, 1995 denying its motion for leave to file replies. All motions, aside from the motions for summary judgment, are **DENIED** as moot.

2. USX has filed motions for summary judgment on its claims for declaratory relief against Consolidation Coal Co., Old Ben Coal Co., and Arch Minerals Corp. and Arch of Kentucky. It has also filed for summary judgment against Carbon Fuel.

3. Most of the decisions on the Coal Act have concerned the constitutionality of its application. See, e.g., Templeton Coal Co., Inc. v. Shalala (Templeton Coal II), 882 F.Supp. 799 (S.D.Ind. 1995); In re Chateaugay Corp., 163 B.R. 955 (S.D.N.Y.1993), aff'd, 53 F.3d 478 (2nd Cir. 1995); Barrick Gold Exploration, Inc. v. Hudson, 823 F.Supp. 1395 (S.D.Ohio 1993), aff'd, 47 F.3d

832 (6th Cir.1995); In re Blue Diamond Coal Co., 174 B.R. 722 (E.D.Tenn.1994). Templeton Coal Co., Inc. v. Shalala (Templeton Coal I), 855 F.Supp. 990 (S.D.Ind.1993). All courts that have considered the constitutionality of the Coal Act, but one, have upheld it under the Due Process and Takings clauses. Judge Smith, in Unity Real Estate Co. v. Hudson, 889 F.Supp. 818 (W.D.Pa. 1995), held the Act, as applied to Unity, violated the Takings clause. Judge Smith issued a preliminary injunction to prevent the immediate, looming bankruptcy of Unity, an undercapitalized remnant of several coal companies, if the Coal Act was enforced against it. Such a pending, drastic impact as alleged in Unity has not been alleged in this action. Further, those constitutional questions are not at issue here.

Various other decisions on non-constitutional aspects of the Coal Act include Fawn Mining Corp. v. Hudson, 878 F.Supp. 240 (D.D.C.1995); Holland v. American Coal Co., Inc., 868 F.Supp. 173 (S.D.W.Va.1994) (Faber, J.); Carbon Fuel Co. v. USX Corp. (Carbon Fuel I), 867 F.Supp. 414 (S.D.W.Va.1994) (Haden, C.J.); In re Carpentertown Coal & Coke Co., Inc., 166 B.R. 279 (Bkrtcy.W.D.Pa.1994).

202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

*Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 24, *and cert. denied,* —— U.S. ——, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). *Accord Patterson v. McLean Credit Union,* 39 F.3d 515, 518 (4th Cir.1994); *Vienna Family Medical Assoc., Inc. v. Allstate Ins. Co.,* 872 F.Supp. 1509, 1511 (S.D.W.Va. 1995); *Sayre v. General Nutrition Corporation,* 867 F.Supp. 431, 432 (S.D.W.Va.1994); *Ambrose v. Knotts,* 865 F.Supp. 342, 343 (S.D.W.Va.1994).

## II

■ Although the underlying history is quite elaborate, the material facts are undisputed. Intricate, but undisputed facts, do not bar summary judgment. *Carpenter v. Harris, Upham & Co., Inc.,* 594 F.2d 388, 395 (4th Cir.1979), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). The Court will recount material facts of the case as briefly as possible. Some discussion, however, also must be devoted to the history of retired coal miners' health benefits, the development of the NBCWAs, and the rationale of the Coal Act.[4]

## A

Coal miners represented by the United Mine Workers of America ("UMWA") have been provided health care benefits through multiemployer plans since 1946, after President Truman ordered the Secretary of the Interior to seize the mines. That seizure, pursuant to the War Labor Disputes Act, was precipitated when the UMWA launched a strike over the issue of health and pension benefits. The Secretary and the UMWA subsequently executed the National Coal Wage Agreement, which temporarily addressed the UMWA's demands and provided welfare funds. That agreement created an unprecedented system for providing health and pension benefits to miners through two separate, industry-wide funds: a "Welfare and Retirement Fund" and a "Medical and Hospital Fund".

In 1947, mine owners began negotiations with the UMWA in anticipation of the return of the mine properties to the owners. These negotiations concluded with the execution of the National Bituminous Coal Wage Agreement of 1947, which merged the two earlier funds into the "United Mine Workers of America Welfare and Retirement Fund".

Labor unrest, however, continued until 1950 when the UMWA and the newly-formed, multi-employer Bituminous Coal Operators Association ("BCOA") negotiated a successor NBCWA. In exchange for the UMWA's acquiescence to mechanization of the mines, the signatories to the 1950 NBCWA established the United Mine Workers Welfare and Retirement Fund of 1950 as an irrevocable trust to be funded on a pay-as-you-go basis, calculable on tons of coal mined. This mechanism continued untouched through successor NBCWAs until 1971.

The negotiations for the 1974 NBCWA generated the first major overhaul of the miners' health and benefits scheme. Because of changes in the population of active

---

4. For more further discussions of the history of the NBCWA benefit funds and the Coal Act *see Chateaugay Corp.,* 53 F.3d at 480–486; *Templeton Coal II,* 882 F.Supp. at 805–810; *Barrick Gold,* 823 F.Supp. at 1398–1400; and John R. Woodrum and Larry P. Rothman, *Proposals for Funding United Mine Workers of America Retiree Health Benefits: The Constitutional Dimensions,* 93 W.Va.L.Rev. 633 (1991).

and retired miners and the enactment of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the UMWA and the BCOA determined changes were needed. Consequently, the 1974 NBCWA first divided the 1950 Welfare and Retirement Fund into the 1950 Benefit Plan and Trust ("1950 Benefit Plan"), which provided nonpension health care benefits for miners retired prior to January 1, 1976, and the 1950 Pension Trust, which continued the pension obligations of the 1950 Welfare and Retirement Fund. Second, the 1974 NBCWA established 1974 Benefit Plan and Trust ("1974 Benefit Plan"), which provided health care benefits for miners retiring after January 1, 1976.[5] The BCOA members and non-members who signed the 1974 NBCWA agreed to fund the multi-employer 1950 and 1974 Benefit Plans based on cumulative hours worked, rather than tons of coal mined.[6] Additionally, and significantly, the 1974 NBCWA provided the health care benefits for retired miners, their spouses, and certain dependents would continue for the life of the covered retirees.

In 1978, the UMWA and the BCOA negotiated a slightly different NBCWA. The new agreement partially dismantled the system developed in 1974. The union and operators agreed to shift from a centralized multiemployer benefit trust to a decentralized scheme in which each signatory operator established and financed its own individual health benefit delivery plan or Individual Employer Plan ("IEP"). Under the new NBCWA, pre–1976 retirees would be covered by the multiemployer 1950 Benefit Plan, and post–1975 retirees would be assigned to a single-employer plan operated by his or her last employer. The 1974 Benefit Plan then would cover only post–1974 retirees whose last employer had gone out of the coal business. Thus, the multi-employer 1974 Benefit Plan would cover "orphaned"[7] post–1974 retired miners as an industry-wide responsibility.

The 1978 NBCWA also contained a clause that fully guaranteed the funding of the benefit and pension funds. In that agreement BCOA members were allowed to increase their contributions to the funds, but they could not decrease them. Further, the 1978 NBCWA incorporated an "evergreen" clause, which has been construed as imposing a perpetual obligation on operators to contribute to the 1950 Benefit Plan. *UMWA 1974 Pension v. Pittston Co.*, 984 F.2d 469 (D.C.Cir. 1993). The structure of the 1978 NBCWA has been maintained by all subsequent NBCWAs, including the 1988 NBCWA.

During the decade of the 1980s many problems arose within the funding scheme provided by the NBCWAs. Numerous employers left the business, leaving retirees to be covered by the 1974 Benefit Plan. Additionally, if an operator continued mining but did not sign a successor NBCWA, it could discontinue its individual employer health plan and shift the cost of its retired miners to the 1974 Benefit Trust. Thus, responsibility for an increasing number of orphan retirees fell on a decreasing number of signatories to the NBCWAs. Until 1988, however, no prefunding requirement or withdrawal liability was imposed on employers who declined to sign a successor NBCWA.

In addition, costs of health care rose steeply between 1980 and 1990. Combined, this created a financial crisis in the administration of the Benefit Plans. The looming insolvency of the Benefit Plans culminated in an eleven-month strike against the Pittston Coal Company in Virginia, in 1989.[8] Then Secretary of Labor Elizabeth Dole intervened and facilitated a settlement that included creation of the Secretary's Advisory Commission on United Mine Workers of America Retiree Health Benefits ("Coal Commission").

---

5. The 1974 NBCWA also established the 1974 Pension Trust, which is not at issue in this dispute.

6. Non-members of the BCOA often signed agreements identical to the provisions of the current NBCWA. These agreements came to be characterized as "me too" agreements.

7. This characterization no doubt arose from references to certain retirees as being financial orphans, *i.e.,* those without a financially responsible "parent" employer.

8. For a scenario of the Pittston strike *see Clark v. International Union, UMWA,* 752 F.Supp. 1291 (W.D.Va.1990).

In November, 1990 the Coal Commission submitted its report finding that retired coal miners have legitimate expectations of health care benefits for life; that was the promise made to them during their working lives and upon which they based their planning for funding retirement. The Commission opined the commitment should be honored. "But today those expectations and commitments are in jeopardy." *Coal Commission Report: A Report to the Secretary of Labor and the American People,* at 1 (November 1990). The Coal Commission also predicted that, absent legislative action, the Benefit Trusts would run a combined deficit of 300 million dollars in 1993. *Id.* at 3. The Coal Commission recommended

> the imposition of a statutory obligation to contribute on current and past signatories, mechanisms to prevent future dumping of retiree health care obligations, authority to utilize excess pension assets and the implementation of state-of-the-art managed care and cost containment techniques.

*Id.* at 60.

After receiving the Coal Commission's Report, Congress undertook its own study of the subject and after two years of deliberations enacted the Coal Act. Congress made its findings and stated its policy as follows:

(a) **Findings.**—The Congress finds that—

(1) the production, transportation, and use of coal substantially affects interstate and foreign commerce and the national public interest; and

(2) in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

(b) **Statement of Policy.**—It is the policy of this subtitle—

(1) to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees in the coal industry;

(2) to allow for sufficient operating assets for such plans; and

(3) to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans.

Coal Act, 106 Stat. 3037 § 19142 (October 24, 1992).

The Act uses three different approaches to provide health care benefits to retired miners. It continues the Individual Employer Plans created pursuant to the 1978 NBCWA and maintained by the successor NBCWAs. 26 U.S.C. § 9711. Then the Act creates two new plans for miners outside the coverage of the IEPs: the United Mine Workers of America Combined Benefit Fund ("Combined Fund") and the 1992 UMWA Benefit Fund.[9] 26 U.S.C. §§ 9702 and 9712.

Only the financing of the Combined Fund is at issue in this dispute.

The *res* for the Combined Fund was established by the combination of the 1950 Benefit Plan and the 1974 Benefit Plan commencing February 1, 1993. 26 U.S.C. § 9702(a)(2). The Combined Fund is financed on a per-beneficiary basis, with each eligible beneficiary assigned to a signatory operator.[10] 26 U.S.C. § 9704. The term "signatory operator" means "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. § 9701(c)(1). An operator is considered to be in business "if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7).

The Secretary assigns each coal industry retiree covered by the Combined Fund to a signatory operator on the following basis:

---

9. "The 1992 UMWA Benefit Plan shall only provide health benefits coverage to any eligible beneficiary who is not eligible for benefits under the Combined Fund and shall not provide such coverage to any other individual." 26 U.S.C. § 9712(b)(1).

10. The Combined Fund was also financed initially by transfers of assets from the 1950 Pension Plan and Abandoned Mine Reclamation Fund. 26 U.S.C. § 9705.

(a) **In general.**—For purposes of this chapter, the Secretary of Health and Human Services shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:

(1) First, to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a).[11]

Each signatory operator thus is responsible for premiums payable to the Combined Fund for the assigned beneficiaries. The annual assessed premium for a signatory operator's assigned beneficiaries is "an amount equal to the product of the per beneficiary premium for the plan year multiplied by the number of eligible beneficiaries assigned to such operator under section 9706." 26 U.S.C. § 9704(b)(1). Congress also provided that "[a]ll liability for contributions to the Combined Fund that arises on and after February 1, 1993, shall be determined *exclusively* under this chapter, including all liability to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for coal production on and after February 1, 1993." 26 U.S.C. § 9708 (emphasis supplied).

An assigned operator may pursue reconsideration of the Commissioner's decision assigning beneficiaries under 26 U.S.C. § 9706(f), however "[n]othing in this section shall preclude the right of any person to bring a separate civil action against another person for responsibility for assigned premiums, notwithstanding any prior decision by the [Commissioner]." 26 U.S.C. § 9706(f)(6). The parties assert this litigation is a civil action allowable by section 9706(f)(6).

**B**

Four separate transactions are at issue in this dispute. Each concerns the transfer of a coal mine and its facilities by lease or sale to a new owner or operator. Each transaction began pursuant to the 1978 and 1981 NBCWAs, which provided the successor owner or operator should continue funding the 1950 Benefit Plan and the 1974 Benefit Plan. USX was a party in all transactions.

**1**

*Carbon Fuel and USX Agreements*

Carbon Fuel and USX entered into a Settlement Agreement dated June 11, 1982 and an Agreement, Lease and Sublease ["Lease"] dated June 12, 1982 through which Carbon sold its mining equipment to USX, leased or subleased its coal properties to USX for a fifteen-year term, and transferred its union and non-union employees to USX. Pursuant to the Successorship Clause of the 1981 NBCWA, USX agreed to "assume and agreed to perform, pay and discharge Carbon's obligations under [the 1981 NBCWA] to the extent such obligations arose with respect to any period after the Closing." Plaintiff's First Amended Complaint, p. 13.[12]

---

11. Effective March 31, 1995, Pub.L. 103–296, Title I, §§ 108(h)(9)(B), 110(a), August 15, 1994, 108 Stat. 1487, 1490, amends 26 U.S.C. § 9706, replacing the Secretary of Health and Human Services with the Commissioner of Social Security.

12. The Successorship Clause of the 1981 NBCWA directed: "This Agreement shall be binding upon all signatories hereto ... and their successors or assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by

Among the obligations assumed by USX was the obligation to make contributions to the 1950 Benefit Trust and the 1974 Benefit Trust.

Disputes developed between Carbon Fuel and USX. Eventually, the parties entered into a second Settlement Agreement dated February 1, 1988. The second agreement provided for the termination of the 1982 Lease. When the lease concluded Carbon Fuel did not resume mining operations at the sites covered by the lease to USX.

After the Coal Act became law, Carbon Fuel was assessed liability by the Secretary of Health and Human Services for approximately 50 retirees [13] covered by the Combined Benefit Fund. *See* 26 U.S.C. §§ 9702 and 9706. On November 8, 1993, Carbon Fuel instituted this action against USX for declaratory judgment and injunctive relief. In essence, Carbon Fuel contends

> all obligations facially assessable against Carbon under the Coal Industry Retiree Health Benefit Act of 1992 ... were contractually assumed by [USX] pursuant to a settlement agreement entered into with Carbon under date June 11, 1982 ("1982 Settlement Agreement") so that by the 1982 Settlement Agreement [USX], as guarantor, [is] required to pay or to reimburse Carbon for the payment of all premiums assessed to Carbon pursuant to the [Coal Act].

Plaintiff's First Amended Complaint, p. 1–2.

USX answered and counterclaimed against Carbon Fuel and initiated a third-party complaint against Arch, Consol, and Old Ben. In its counterclaim USX seeks "a declaration of the rights and obligations of the parties here-

to under the [Coal Act] and successorship provisions contained in their labor agreements with the [UMWA] and the impact of same on agreements that transferred coal operations, property, plant and equipment between or among any of these parties." USX Counterclaim, p. 12. USX contends that if the interpretation of the Coal Act asserted by Carbon Fuel is correct, then the same construction should transfer liability for assessments to the Combined Benefit Fund from USX to the Third–Party Defendants under separate settlement agreements. USX Counterclaim, p. 24.

### 2
### *Arch and USX Agreements*

Arch and USX entered into an asset sale and purchase agreement on September 24, 1984 by which USX sold to Arch the coal operations, property, plant, equipment, and coal reserves of USX's Lynch District ("Arch Agreement").[14] All of USX's active UMWA-represented employees at the Lynch operations were assumed by Arch:

> [Arch] will recognize the UMWA as the collective bargaining representative of the employees at Lynch District currently represented by the UMWA.... [Arch] will assume [USX's] obligations under the collective bargaining agreement dated June 7, 1981, then in effect between [USX] and the UMWA applicable to such employees. [Arch] will discharge all of [USX's] obligations under such collective bargaining agreement to the extent that such obligations arise with respect to the period after the Closing.

USX Counterclaim, p. 19–20. Under this agreement, USX retained responsibility for

---

this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement ... provided that the [assigning] Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and that the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement." 1981 NBCWA, Article I.

**13.** As used in the decision, the term "retirees" includes all retirees, spouses, and other eligible beneficiaries covered by the Combined Benefit

Fund. Under the Coal Act an "eligible beneficiary" is defined an "an individual who—(1) is a coal industry retiree who, on July 20, 1993, was eligible to receive, and receiving, benefits from the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, or (2) on such date was eligible to receive, and receiving, benefits in either such plan by reason of a relationship to such retiree." 26 U.S.C. § 9703(f).

**14.** As designated by USX, the Lynch District included coal operations in Harlan, Letcher, Knox, and Whitley Counties, Kentucky, and in Wise County, Virginia.

employees who retired after 1975 and before the Closing, through its Individual Employer Plan ("IEP"). Arch assumed the obligation to make continuing payments to the multi-employer 1950 and 1974 Benefit Plans for miners who retired prior to 1976. All miners who retired after the Closing were covered by Arch's IEP.

After the Coal Act became effective, USX was assessed liability to the Combined Fund for 628 retirees who worked for USX at the operations transferred to Arch.[15] USX contends this liability was transferred to Arch with the mining operations and NBCWA obligations transferred under the Arch Agreement. USX argues the Coal Act either codified and continued the NBCWA obligations transferred to Arch, or created new liability arising after the Closing and for which Arch is responsible under the Arch Agreement. Arch asserts, in its motion for summary judgment, that all liabilities related to service to USX prior to the Closing remain with USX under their agreement. Arch also asserts the premiums due the Combined Fund are not a collective bargaining obligation, but are a new statutory obligation not covered by their agreement.

### 3

*Consol and USX Agreements*

Consol and USX entered into an asset sales agreement on November 22, 1983, by which USX sold to Consol its Robena/Dilworth Operations, including the property, plant, equipment, and coal reserves ("Consol Agreement").[16] All of USX's active UMWA-represented employees at the Robena/Dilworth Operations became represented employees of Consol. The Consol Agreement included the following assumption provision pursuant to the Successorship Provision of the 1981 NBCWA, *supra*, note 12:

> Consol will recognize the UMWA as the collective bargaining representative of the employees at the Operating Properties currently represented by the UMWA.... Consol will assume as of the closing [USX's] obligations under the collective bargaining agreement dated June 7, 1981, then in effect between [USX] and the UMWA applicable to such employees. Subject to Article IV(b), Consol will discharge all of [USX's] obligations under such collective bargaining agreement to the extent that such obligations arise with respect to the period after the Closing.

USX Counterclaim, p. 20. Through this provision Consol was obligated to contribute to the 1950 and 1975 Benefit Plans for miners who retired prior to 1976. As mandated by the NBCWA, USX provided health benefits through its IEP to miners who retired from the transferred operations after 1975 and before the Closing. All miners who retired after the Closing are covered by Consol's IEP.

After the Coal Act became effective, USX was assessed liability to the Combined Fund for 2,311 miners who worked for USX at the operations transferred to Consol.[17] USX contends this liability was transferred to Consol with the mining operations and the NBCWA obligations were transferred under the Consol Agreement. Parallel to its argument against Arch, USX asserts the Coal Act either codified or continued the NBCWA obligations to the 1950 and 1975 Benefit Plans transferred to Consol, or created new liability arising after the Closing and for which Consol is responsible under their agreement.

---

15. USX claimed it was wrongly assigned liability for 628 retirees in its Counterclaim, p. 23. USX later claimed that 581 retirees were wrongly assigned to it from operations transferred to Arch. USX's Memorandum in Support of Motions for Summary Judgment, p. 18. Although a discrepancy apparently exists internal to USX's claim, such discrepancy in the number of retirees assigned does not raise a genuine issue of material fact: the number of retirees assigned is not relevant to a determination of which party has responsibility to pay the premiums due on their behalf.

16. As designated by USX, the Robena/Dilworth Operations included coal producing properties in Greene County, Pennsylvania, the Robena Processing Plant, and the Robena and Dilworth mines.

17. USX claimed it was wrongly assigned liability for 2,311 retirees in its Counterclaim, p. 23. USX later claimed that 643 retirees were wrongly assigned to it from operations transferred to Consol. USX Memorandum in Support of Motion for Summary Judgment, p. 13. As in note 15, this apparent discrepancy does not raise a genuine issue of material fact.

Consol, in its motion for summary judgment, asserts the resolution of their dispute is governed solely by the terms of their agreement and the 1992 Coal Act is not applicable. Consol contends their agreement provides all liability for benefits arising after the Closing for miners who retired prior to Closing is assigned to USX. Consol cites the following provision in the Consol Agreement as evidence of this intent:

All active represented employees of [USX] at the Operating Facilities as of Closing shall become represented employees of Consol as of Closing, it being the intention of the Parties that Consol have no liability or responsibility for any benefits due or that may become due in the future to employees of [USX] who have retired prior to Closing, unless and until any such retired employee may be subsequently employed by Consol at its discretion outside its obligations pursuant to this Agreement.

Consol's Memorandum in Support of Summary Judgment, p. 7.

### 4
### *Old Ben and USX Agreements*

Old Ben and USX entered into an asset sales agreement on April 9, 1981, by which USX sold to Old Ben its Crystal Block No. 20 Mine in West Virginia as well as other coal reserves ("Old Ben Agreement").[18] All of USX's active UMWA-represented employees at the transferred operations were assumed by Old Ben. The Old Ben Agreement included the following assumption provisions pursuant to the Successorship Provision of the 1978 NBCWA:

BUYERS will recognize the UMWA as the collective bargaining representative of the employees in the bargaining units which are currently represented by the UMWA. BUYERS will assume the collective bargaining agreements then in effect.... BUYERS will discharge all of USX's obligations under such collective bargaining agreements, including obligations to make contributions to the 1950 Pension Plan, the 1950 Benefit Plan, the 1974 Pension Plan,

and the 1974 Benefit Plan, to the extent that such obligations arose with respect to a period after the Business Closing.... [USX's] obligations to make contributions to the above employee benefit plans shall be limited to the obligations set forth in the 1978 National Bituminous Coal Wage Agreement or its successor to make contributions for hours worked or tons of coal mined prior to the Business Closing.

USX Counterclaim, p. 19 (emphasis in original) and USX Memorandum in Support of Motion for Summary Judgment, p. 20–21. The agreement provided for USX to retain responsibility for employees who retired after 1975 and before the Closing, through its IEP. Old Ben became responsible for the obligation to make payments to the 1950 and 1974 Benefit Plans for miners who retired prior to 1976. All miners who retired after the Closing were covered by Old Ben's IEP.

After the Coal Act became law, USX was assessed liability to the Combined Fund for approximately 30 retirees who worked for USX at the operations transferred to Old Ben. As above, USX contends this liability was transferred to Old Ben with the mining operations and NBCWA obligations transferred under the Old Ben Agreement. USX asserts the Coal Act either codified or continued the NBCWA obligations transferred to Old Ben, or it created new liability arising after the Closing and for which Old Ben is responsible under their agreement. In its memorandum in support of its motion for summary judgment, Old Ben adopted the arguments asserted by Arch in support of its motion.

### III

All the parties base their primary arguments for or against summary judgment in the agreements covering their respective transfers or purchases of coal operations. In essence, they argue that their pre-enactment contracts assign liability or provide indemnity to cover premiums payable to the Combined Fund which control over conflicting provisions of the Coal Act. This theory of

**18.** In addition to the Crystal Block No. 20 Mine, USX transferred coal reserves in Greene County, Pennsylvania, Mingo and Logan Counties, West Virginia, Vermillion County, Illinois, and Carbon County, Utah.

the primacy of pre-enactment contracts is advanced with the implicit assertion Congress did not create a new liability in the last employers. In their view the Coal Act provides little or no guidance to the Court to determine liability for premiums to the Combined Fund in this dispute. This view is unsupportable in light of the clear Congressional intent to place liability for obligations to the Combined Fund firmly on a retiree's last signatory employer.

Proper construction of the Coal Act to this dispute yields a result that maintains the assignments originally made by the Secretary. Such an outcome parallels and comports with the parties' intentions, when they apportioned their responsibilities under their various sales agreements.

Despite the parties' lengthy and contrary arguments, their pre-enactment contracts do not control the imposition of liability to the Combined Fund. Congress manifested a plain intention that all liability for premiums to the Combined Fund be determined exclusively under the terms of the Coal Act. The Act explicitly provides "[a]ll liability for contributions to the Combined Fund that arises on and after February 1, 1993, shall be determined *exclusively* under this chapter, including all liability for contributions to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for coal production on and after February 1, 1993." 26 U.S.C. § 9708 (emphasis supplied). Thus, it is apparent the parties' liabilities to the Combined Fund cannot be determined by giving precedence to their pre-existing contractual arrangements. The Act mandates its provisions be applied to resolve the controversies.

Contrary to the parties' assertions, Congress was not bound by the terms mandated by the NBCWAs in the parties' contracts in crafting its solution to the financial problems plaguing the 1950 and 1974 Benefit Plans. Congress was not required to provide a precise, mathematical conformity among the parties' contractual obligations under the NBCWAs and their Coal Act obligations. *Templeton Coal II*, 882 F.Supp. at 819. As recently explained by the Court of Appeals for the Second Circuit:

[T]he terms of the NBCWAs cannot limit Congress's authority to enact subsequent legislation requiring the coal industry to fulfill its promises. As [*Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986),] explained:

> "Contracts ... cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 416, 79 L.Ed. 885 (1935).

> If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.

475 U.S. at 223–24 [106 S.Ct. at 1025]. *Chateaugay Corp.*, 53 F.3d at 495. *See Concrete Pipe & Prod. v. Const. Laborers Pen. Tr.*, —— U.S. ——, ——, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993).

■ This Court has upheld obligations under the Coal Act even though the contractual obligation under the applicable NBCWA had expired. *Holland v. American Coal Co., Inc.* 868 F.Supp. 173, 176 (S.D.W.Va.1994) (Faber, J.). *See also Blue Diamond Coal*, 174 B.R. at 729–30 (Court upheld obligation to Combined Fund although company ceased contributing to UMWA Plans in 1964.). The reach of the Act broadly requires every present and former coal operator who signed any NBCWA from 1950 to 1988 and who remains in existence in any form to contribute to the new Combined Fund, regardless of the terms of their past agreements. *See Templeton Coal I*, 855 F.Supp. at 998.

■ It has been argued that 26 U.S.C. § 9706(f)(6) allows parties to bring a civil action and litigate their responsibility for as-

signed premiums based on pre-enactment contracts. This interpretation would allow § 9706(f)(6) to pull pre-enactment contracts into the congressional scheme. Nothing, however, in the statute specifically revives pre-enactment contracts purporting to transfer obligations to the 1950 and 1974 Plans as being controlling in litigation over post-enactment assigned premiums to the Combined Fund. Instead, § 9706(f)(6) must be read in conjunction with subsection (b)(2) of the statute, which provides for reassignment of obligations only after the enactment date:

> If a person becomes a successor of an assigned operator *after the enactment date,* the assigned operator may transfer the assignment of an eligible beneficiary under subsection (a) to such successor, and such successor shall be treated as the assigned operator with respect to such eligible beneficiary for purposes of this chapter. Notwithstanding the preceding sentence, *the assigned operator transferring such assignment (and any related person) shall remain the guarantor of the benefits provided* to the eligible beneficiary under this chapter. An assigned operator shall notify the trustees of the Combined Fund of any transfer described in this paragraph.

26 U.S.C. § 9706(b)(2) (emphasis added). Thus, under this provision, two limitations are placed on the ability to transfer assigned premiums: (1) the transfers may occur only after the enactment date; and (2) the transferor remains the guarantor of the benefits. These conditions must be met in any action brought to affix responsibility for assigned premiums under § 9706(f)(6).

The limitations placed on transfers of responsibility for assigned premiums are consistent with Congress's intent to place responsibility on the last employers of the retirees. The Coal Act is designed to overcome past avoidance and prevent future avoidance of employer responsibility for the miners' promised retirement benefits. Last signatory operators are not permitted to transfer liability based on contracts entered many years prior to the enactment of the Coal Act. Rather, obligations may be transferred only after they were generated by the Act. Further, if such a transfer does occur, the last employer retains responsibility as a guarantor of such benefits.[19]

In a secondary argument, USX contends its contracts transferring continuing liability for retirees to Arch, Consol, and Old Ben per NBCWA obligations are valid because the Coal Act codifies the evergreen obligations of the NBCWAs' multi-employer benefit plans. It asserts the Act simply changes the then-existing funding obligations to the 1950 and 1974 Benefit Funds into the statutory obligations to pay premiums to the Combined Fund. This assertion is likewise unsupportable.

Through the Coal Act, Congress intended "to remedy problems with the provision and funding of health care benefits[.]" 106 Stat. 3037, § 19142(b)(1). As such, it did not ratify the flawed and inadequate funding schemes of the 1950 and 1974 Plans, but instead created a completely new payment mechanism. Payments to the 1950 and 1974 Plans were made on a per-ton-mined or per-hour-worked basis. Since the 1950 and 1974 Plans were multi-employer plans, responsibility for premiums was not connected to a company's retirees. Payments to the old Plans supported all covered miners irrespective of their last employment. A company could withdraw from the Plans and leave its retirees to be supported by premiums paid by its competitors.

Payments to the Combined Fund are made on a per-beneficiary basis, and relate directly to the support of specific retirees. These payments are made by a coal operator to provide benefits for its retired miners. As such, this new, per-beneficiary payment mechanism is much closer to the Independent Employer Plans developed under the 1978 NBCWA, than to the multi-employer 1950 and 1974 Plans. The potential for abusive dumping of retirees, so they would be supported by other operators, inherent in the multiemployer Plans, which for years did not

---

**19.** The retention of the assigned operator as a guarantor of benefits despite a transfer provides an additional safeguard against sham transac-

tions supplemental to the provisions of 26 U.S.C. § 9722.

provide for withdrawal liability, has been excised. Of course, some aspects of multiemployer plans remain, mainly the premium for orphaned miners, but the pure multiemployer scheme is no more. Instead the Combined Fund is a hybrid creation mixing responsibility for designated retirees with an industrywide responsibility for orphans.

The Act, at least in one sense, does codify some of the obligations created through the NBCWAs. It codifies the benefit levels provided under the NBCWAs. For the health benefits provided under the Combined Fund, the Coal Act provides "coverage under the managed care system shall to the maximum extent feasible be *substantially the same as (and subject to the same limitations of) coverage provided under the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan as of January 1, 1992.*" 26 U.S.C. § 9703(b)(1) (emphasis added). Additionally, "[t]he trustees of the Combined Fund shall provide death benefits coverage to each eligible beneficiary ... which is *identical to the benefits provided under the 1950 UMWA Pension Plan or the 1974 UMWA Pension Plan,* whichever is applicable, on July 20, 1992." 26 U.S.C. § 9703(c)(1) (emphasis added).[20]

■ Simply put, prior contractual transfers of obligations under the NBCWAs' 1950 and 1974 Plans are ineffective to transfer obligations under the Coal Act. "No right to payment on the part of the Combined Fund existed until the enactment of the Coal Act[.]" *Chateaugay Corp.,* 53 F.3d at 497.

"Claims under the Coal Act were not in any sense 'contingent' or 'unmatured' [prior to enactment]; they simply did not exist." *In re Chateaugay Corp.,* 154 B.R. 416, 419 (S.D.N.Y.1993).

The parties' contractual obligations entered prior to the enactment of the Coal Act are not continued under the Act. The private provisions required by the applicable NBCWAs do not survive, nor are they codified, ratified, confirmed, or renewed. The prior allocations of responsibility are abrogated. The Act reaches back and places all liability on the last signatory operator who employed the miner at his or her retirement. In designing this revival of responsibility, the Congress acted broadly and forcefully to renew obligations many operators thought they had cast off years ago.[21] Congress decided an operator may not avoid its promised responsibility for retirement benefits based on its Contracts preexisting the Act. Accordingly, neither Carbon Fuel nor USX can rely on pre-enactment contracts to shift such liability.

■ Although the results may not be fair to the settled expectations of Carbon Fuel and USX, Congress acts well within its power in reviving this liability.[22] Congress's decision to revert liability for promised retirement benefits back to the last employers "clearly interferes with the [parties'] expectations regarding their obligations to pay for their retirees' health benefits." *Barrick Gold,* 823 F.Supp. at 1409.[23] However, "[i]t

---

**20.** The Coal Act also provides that the benefits provided under the 1992 UMWA Benefit Plan shall be "substantially the same as (and subject to all the limitations of) coverage provided under the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan as of January 1, 1992", 26 U.S.C. § 9712(c)(1), and that the benefits provided under IEPs "maintained pursuant to a 1978 or subsequent coal wage agreement shall continue to provide health benefits coverage to such individual and the individual's eligible beneficiaries which is substantially the same as (and subject to all the limitations of) the coverage provided by such plan as of January 1, 1992", 26 U.S.C. § 9711(a).

**21.** One court has referred to the Coal Act's herculean ability to reach through decades to past employers as "super-reachback". *Blue Diamond Coal,* 174 B.R. at 724.

**22.** This exercise of congressional power was questioned by Congressman Rostenkowski who noted: "There are also companies who made certain that when they sold their coal operations the price paid by the purchaser under the buy-sell agreement reflected the full assumption of retiree health organizations by the purchaser. I wonder how equitable it is to reach back to the selling company which received a lower sales price in this case." 138 Cong.Rec. H11399–01, H11408 (October 5, 1992).

**23.** The Supreme Court has stated unequivocally "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). *See*

is not an appropriate function of the courts to evaluate whether Congress most correctly and fairly assessed the blame ... when it enacted the Coal Act." *Templeton Coal I,* 855 F.Supp. at 1003. "[T]he Coal Act must be viewed as a rational legislative response to a crisis in coal retiree health benefits. It is the product of legislative thought, analysis and compromise and there is no evidence that Congress acted arbitrarily or without prior substantive investigation and debate." *Blue Diamond Coal,* 174 B.R. at 729. "There is nothing irrational or arbitrary in Congress' placing liability for paying for the lifetime health benefits promised to the beneficiaries of the Combined Fund on all those who collectively made that promise." *In re Chateaugay Corp.,* 163 B.R. 955, 963 (S.D.N.Y.1993). "A congressional decision to come down on the side of the retirees and their spouses and dependents is not totally void of reason. It may not be the best or fairest choice, but it is not irrational or arbitrary in the constitutional sense." *Templeton Coal I,* 855 F.Supp. at 1002.

Carbon Fuel was the last signatory employer of the retirees for whom it was assigned responsibility for premiums to the Combined Fund. It is also undisputed that USX was the last signatory employer of the retirees for whom it was assigned responsibility for premiums to the Combined Fund. Each was assigned responsibility by the Secretary pursuant to 26 U.S.C. § 9706(a).

The Secretary followed the clear intent of Congress by placing responsibility for promised retirement health care benefits on the last employer of each retiree. Congress identified the last signatory employers of retirees as the "persons most responsible for plan liabilities." *See* 106 Stat. 3037, § 19142(a)(2). The Conference Report on the Coal Act provides "[t]he essence of the Conference Agreement is that those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements." 138 Cong.Rec. S17566–01, S17603 (October 8, 1992). The Conference Report further states:

> Both earlier bills and the Conference Agreement requires those companies which once were signatory to coal wage agreements with contribution obligations to *resume* paying for the cost of providing benefits to retirees assigned to them, *even though those companies no longer have a contractual obligation to do so under their current relationship with the UMWA.* The drafters in both cases took into consideration the claim of these so-called "reach back" companies that they had bargained out of their funding obligations. It was determined, however, that an equitable solution would require that such companies remain obligated to help fund the benefit program which covers retired persons who worked for those companies.

*Id.* (emphasis added).

In addition to the Conference Report, several Senators commented on the Coal Act. Senator Rockefeller, an early sponsor of the legislation, stated "[i]nstead of including a broad industrywide tax, the basic funding mechanism of this legislation generally requires premium payments from those for whom the retirees worked. These are the responsible companies." 138 Cong.Rec. S17625–03, S17633 (October 8, 1992).[24] Senator Rockefeller further emphasized "that the relief crafted in the bill is tailored narrowly to address the problem, imposing obligations on a specified group of businesses that were connected ultimately to the commitment to provide health care." *Id.* at § 17634. Also, Senator Warner noted "[i]n general, dating back to 1950, the former employer of the longest duration will be as-

---

*Concrete Pipe & Prod. v. Const. Laborers Pen. Tr.,* —— U.S. ——, ——, 113 S.Ct. 2264, 2292, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986).

**24.** Such reasoning parallels the Supreme Court's decision in *Usery,* in which the Court found "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities on those who have profited from the fruits of their labor—the operators and the coal consumers." 428 U.S. at 18, 96 S.Ct. at 2893.

signed the health costs of the retiree." *Id.* at § 17636. Further, Senator Glenn stated "premium payments will be made only by those for whom the retirees worked." 138 Cong.Rec. S18250–02 (October 8, 1992).

Further evidence of Congress's intent is found in the debates of the House of Representatives. Congressman Roukema noted: "The essence of the bill is that those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing health care benefits promised in their various collective bargaining agreements." 138 Cong.Rec. H11427–01, H11443 (October 5, 1992).[25]

Placing the responsibility for premiums on the last signatory employers creates a new baseline for determining responsibility for retirees. All the conventions and schemes of the various NBCWAs were washed away. The perpetual funding obligations of the NBCWAs ended with the creation of the Combined Fund. The responsibility for promised retirement benefits rests where it did initially—on the employer who retired each miner and promised him or her benefits. Any mechanism for avoidance of such responsibility, generated prior to the Act, is gone.

█ The transfer of a coal mine or other facility covered by an NBCWA does not alter the Congress's assessment of liability. Liability to the Combined Fund does not follow the transfer of equipment, coal reserves, permits, other properties or rights, or a collective bargaining unit. It remains on the last employer, despite the employer having transferred the mine or facility from which the retiree worked and retired from. Only post-enactment transfers of the newly-created obligations allow a last signatory employer to partially avoid its obligations. Accordingly, the Court holds the liability for premiums to the Combined Fund must remain as the Secretary placed it—upon Carbon Fuel and USX as the last signatory employers of the retired miners.

█ This application of the Coal Act is, coincidentally, completely attuned to the parties' intentions and expectations embodied in their settlement agreements. Under their agreements, Carbon Fuel and USX expected to transfer obligations that arose after the closings. This included the continuing obligations to the 1950 and 1974 Benefit Plans. They expected to retain responsibility for obligations arising before the closings. Although the obligations to the Combined Fund did not exist before the enactment of the Coal Act, the obligations arose during the final employment of each miner. Although creating new liability, "the Coal Act links operator liability to previous employment relationships[.]" *Chateaugay Corp.,* 53 F.3d at 489.[26] In this dispute, then, these obligations arose prior to the closings when each miner retired from Carbon Fuel or USX. As such, if the parties' agreements were applied Carbon Fuel and USX would remain responsible for premiums on miners who retired prior to the closings. Applying the parties' agreements would not change the result.

---

**25.** Congressman Roukema also cautioned "the provisions of the Coal Industry Retiree Health Benefits Act address a rather unique situation and are not intended to serve as a precedent involving the retiree health benefit plans in other industries." 138 Cong.Rec. H11427–01, H11443 (October 5, 1992).

**26.** Again, the Court finds a parallel in *Usery,* where the Supreme Court found a similar scheme did not violate the Constitution, noting:
To be sure, insofar as the [Black Lung Benefits Act of 1972] requires compensation for disabilities bred during employment terminated before the date of enactment, the Act has some retrospective effect—although, as we have noted, the Act imposed no liability on operators until 1974. And it may be that the liability imposed by the Act for disabilities suffered by former employees was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.
428 U.S. at 15–16, 96 S.Ct. at 2892–2893 (footnotes omitted). *See Concrete Pipe & Prod. v. Const. Laborers Pen. Tr.,* — U.S. —, —, 113 S.Ct. 2264, 2292, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986).

## IV

In summary, the Coal Act controls the determination of liability for premiums to the Combined Fund. Contracts entered prior to enactment that shift obligations to the 1950 and 1974 Plans are trumped by the provisions of the Act, which restore liability for retirement benefits to the last signatory employer. The Act broadly places this liability on the last employer to avoid the problems associated with avoiding such liability that plagued the 1950 and the 1974 Plans. Accordingly, the obligations to the Combined Fund determined by the Secretary on Carbon Fuel and USX remain undisturbed. The Court **ORDERS** USX's motion for summary judgment against Carbon Fuel is **GRANTED,** further, the motions for summary judgment filed by Arch, Consol, and Old Ben against USX are also **GRANTED.** The remaining motions for summary judgment are **DENIED** and this case is **DISMISSED** from the docket of the Court.

The Clerk is directed to send a copy of this Order to counsel of record.