**ADVENTURE RESOURCES, INC., et al., Plaintiffs,**

v.

**Michael H. HOLLAND, et al., Defendants.**

**Michael H. HOLLAND, et al., Intervenor Counter–Plaintiff Trusts,**

v.

**ADVENTURE RESOURCES, INC., et al., Counter–Defendants.**

**Civil A. No. 2:94–0858.**

United States District Court, S.D. West Virginia, Charleston Division.

March 8, 1996.

John A. Rollins, Sarah Sullivan, Webster J. Arceneaux, III, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, WV, for plaintiffs and counter-defendants.

Larry D. Newsome, Barbara E. Locklin–George, Kenneth M. Johnson, UMWA Health & Retirement Funds, Office of General Counsel, Washington, DC, Susan Cannon–Ryan, Caldwell, Cannon–Ryan & Riffee, Charleston, WV, for defendants.

Paul A. Green, Marilyn L. Baker, Beins, Axelrod, Osborne, Mooney & Green, Washington, DC, Peter Buscemi, Morgan, Lewis & Bockius, Washington, DC, Jami Wintz McKeon, Morgan, Lewis & Bockius, Philadelphia, PA, for United Mine Workers of America Combined Benefit Fund.

Bernard McKay, U.S. Department of Justice, Washington, DC, Rebecca A. Betts, Gary L. Call, Asst. United States Attorney, Charleston, WV, Charlotte Hardnett, Office of General Counsel, Region III, Social Security Administration, Philadelphia, PA, for Donna E. Shalala, Secretary, Department of Health & Human Services.

John A. Rollins, Sarah Sullivan, Webster J. Arceneaux, III, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, WV, for debtors-in-possession.

Brian H. Benjet, UMWA Health & Retirement Funds, Office of General Counsel, Washington, DC, Susan Cannon–Ryan, Caldwell, Cannon–Ryan & Riffee, Charleston, WV, David W. Allen, General Counsel, Larry D. Newsome, Asst. Gen. Counsel, UMWA Health & Retirement Funds, Office of General Counsel, Washington, DC, for intervenors-defendants and counter-claimants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the motion for partial summary judgment of the Defendant/Intervenor Counter–Plaintiffs (the Funds).[1] For the reasons

---

1. The Funds is a shorthand reference to the UMWA Health and Retirement Funds. The Funds consists of six trusts: (1) the UMWA 1950 Pension Trust; (2) the 1974 Pension Trust; (3) the Cash Deferred Savings Plan of 1988; (4) the UMWA Combined Benefit Fund (Combined

set forth below, the Court **GRANTS** in part and **DENIES** in part the Funds' motion.

## I. INTRODUCTION

The substance of this adversary proceeding raises complicated issues under the Coal Act, the Bankruptcy Code and the parties' collective bargaining agreements. Accordingly, it is helpful to provide some background on these statutes and contracts.

An exhaustive treatment of the Coal Act is unnecessary. The Act's details and the history leading to its enactment can be found elsewhere. *See, e.g., Carbon Fuel Co. v. USX Corp.,* 891 F.Supp. 1186, 1189–92 (S.D.W.Va.1995) (Haden, C.J.), *appeal pending,* No. 95–2496 (4th Cir. Aug. 9, 1995). Only a general outline of the Coal Act is necessary to provide a frame of reference for some of the arguments asserted by the Funds.

The Coal Act was enacted on October 24, 1992 and became effective February 1, 1993. *In re Chateaugay Corp.,* 53 F.3d 478, 486 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). The Coal Act contains three mechanisms for the provision of health care benefits to retired miners. First, the Act continues the Individual Employer Plans (IEPs) created pursuant to the 1978 NBCWA and maintained by the successor NBCWAs.[2] *See* 26 U.S.C. § 9711(a).

The other two mechanisms are the Combined Fund and the 1992 Plan, which are financed in large part through per beneficiary premiums payable by companies to whom responsibility is attributed for individual beneficiaries of those plans. *See* 26 U.S.C. §§ 9702(a)(1), 9712(a)(1), 9704(b)(2), 9712(d)(1)(B). Each of these alternative mul-

tiemployer plans is discussed in more detail below.

■ The Combined Fund covers beneficiaries eligible for and receiving benefits from the UMWA 1974 Benefit Plan and the 1950 Benefit Plan as of July 20, 1992. 26 U.S.C. § 9703(e). These separate plans were merged into the Combined Fund effective February 1, 1993. 26 U.S.C. §§ 9702(a)(2). The Combined Fund is authorized to collect claims pre-existing the Act. 26 U.S.C. § 9708. Every coal operator who signed or otherwise became bound to an NBCWA at anytime is required to participate in the Combined Fund's financing. 26 U.S.C. § 9701(b), (c)(1); *Davon Inc. v. Shalala,* 75 F.3d 1114, 1117 (7th Cir.1996). The premium scheme for the Combined Fund involves several coordinated mechanisms. The primary financing of the Combined Fund comes from per beneficiary premiums paid by "assigned operators" and their related persons under § 9704(a), based on the number of beneficiaries assigned to them by the Secretary of Health and Human Services according to an assignment process. *See generally* 26 U.S.C. § 9706. These premiums were to be calculated "for each plan year beginning on or after February 1, 1993 . . . ." 26 U.S.C. § 9704(b)(2).

The 1992 Plan is essentially the new "orphan plan." The 1992 Plan is required to provide health coverage for certain individuals who are not receiving benefits from the Combined Fund or from their last signatory operator's § 9711 plan. 26 U.S.C. § 9712(b)(2); *see Holland v. Double G. Coal Co.,* 898 F.Supp. 351, 354 (S.D.W.Va.1995) (stating the 1992 Plan was intended as a

---

Fund); (5) the UMWA 1992 Benefit Plan (1992 Plan); and (6) the UMWA 1993 Benefit Plan. The first three trusts are referred to collectively as the "Pension Plans."

The Pension Plans were established under a series of National Bituminous Coal Wage Agreements (NBCWAs) to provide pensions, retirement savings opportunities and death benefits to retired coal miners and their surviving spouses. The Combined Fund and the 1992 Plan were established in accordance with the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act" or the "Act"), 26 U.S.C. §§ 9701 *et seq.* to provide retiree health benefits to two specific sets of beneficiaries. The 1993 Benefit Plan was established by the most recent NBCWA and pro-

vides retiree health benefits to a third set of beneficiaries under separate eligibility rules.

**2.** *Carbon Fuel* briefly explains the genesis of the IEP:

In 1978, the UMWA and the BCOA negotiated a slightly different NBCWA. The new agreement partially dismantled the system developed in 1974. The union and operators agreed to shift from a centralized multiemployer benefit trust to a decentralized scheme in which each signatory operator established and financed its own individual health benefit delivery plan or . . . "IEP"[.]

*Carbon Fuel,* 891 F.Supp. at 1190.

"backstop" to the Combined Fund and the IEP scheme).[3]

■ The 1992 Plan enrolls beneficiaries upon determining they are eligible for coverage. The Coal Act imposes an ongoing duty on the last signatory operator and its related persons to pay annual prefunding premiums and monthly per-beneficiary premiums to the 1992 Plan for every month the 1992 Plan provides health benefits to the operator's retirees. 26 U.S.C. § 9712(d)(1)(B).

There are also payment obligations associated with the applicable NBCWAs. In addition to Adventure's statutory obligations under the Act, it may be required to pay contributions under these wage agreements.[4]

## II. FACTUAL AND PROCEDURAL BACKGROUND

Given the facts are not disputed, the Court will summarize how this controversy developed.

H. Paul Kizer, the owner of the Adventure companies, started Maben Energy in 1971 and acquired an ownership interest in many of the Adventure companies in 1977. By the mid–1980s, the number of companies had proliferated. Nevertheless, all were consolidated under Kizer's sole ownership before bankruptcy. By the late 1980s, Adventure was touted as "the largest independent coal producer in West Virginia and the 49th largest independent coal producer in the United States." Ex. 25.

Unfortunately, the Adventure companies began to experience financial setbacks resulting in, *inter alia*, the December 1992 filing of petitions by twenty companies related to Adventure Resources, Inc., under Chapter 11 of the Bankruptcy Code. Proofs of claim for unpaid contributions and premiums were filed timely by the Funds. On December 14, 1993 Adventure[5] initiated this adversary proceeding by filing a complaint seeking disallowance of the Funds' claims.

There are over 500 beneficiaries for whom the Adventure companies are responsible, including retired miners and eligible dependents.[6] Adventure has not paid per beneficiary premiums to the Combined Fund since December 1994. As of November 25, 1995

---

**3.** Section 9712(b)(2) sets forth the reach of coverage for the 1992 Plan in its definition of "eligible beneficiary," which is defined as an individual who

> **(A)** but for the enactment of this chapter, would be eligible to receive benefits from the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, based upon age and service earned as of February 1, 1993; or **(B)** with respect to whom coverage is required to be provided under section 9711, but who does not receive such coverage from the applicable last signatory operator or any related person,

and any individual who is eligible for benefits by reason of a relationship to an individual described in subparagraph (A) or (B). In no event shall the 1992 UMWA Benefit Plan provide health benefits coverage to any eligible beneficiary who is a coal industry retiree who retired from the coal industry after September 30, 1994, or any beneficiary of such individual. *Id.*

**4.** Coal industry retirees have been promised pensions and health benefits under collective bargaining agreements dating back to 1947. *See generally Carbon Fuel,* 891 F.Supp. at 1189–91. The UMWA and the Bituminous Coal Operators Association established several multiemployer plans, including the UMWA 1950 Pension Trust, 1974 Pension Trust, the 1950 Benefit Plan, and the 1974 Benefit Plan. The 1993 NBCWA established the 1993 Benefit Plan to provide health benefits for certain retirees not covered by the Coal Act and requires employer contributions to the Cash Deferred Savings Plan of 1988 to defray the costs of administering the trust. While Congress, via ERISA, has sought to assure timely payment and streamlined collection of delinquent contributions to multiemployer pension plans, Adventure has often acted to the contrary. *See* Ex. 8 to Funds' Mot. for Partial Summ. Jgt., *Connors v. Adventure Resources, Inc.,* No. 5:90–0209 (S.D.W.Va. Nov. 8, 1991). The exhibits to the Funds' motion will hereafter be denominated "Ex. '[blank]'."

**5.** "Adventure" refers to the twenty Plaintiff Chapter 11 debtor companies *as well as to* eight to ten Plaintiff non-bankrupt affiliates. In all, there are 46 Adventure companies, some operating and some defunct. Various members of the group have been signatory to NBCWAs since 1974. Adventure is currently signatory to a 1993 NBCWA under the names of Maben Energy Corporation and a list of affiliates. *See* Ex. 2.

**6.** The Funds acknowledge the precise numbers of attributable beneficiaries in the Combined Fund and the 1992 Plan go up or down as more beneficiaries are enrolled in the plans, leave the plans due to mortality or other circumstances, or as the Social Security Administration's assignments are adjusted.

Adventure's delinquent Combined Fund premiums totalled over 1.2 million dollars, and currently accrue at a rate of over one hundred fifty thousand dollars ($150,000) per month. Adventure never has paid per beneficiary premiums to the 1992 Plan.[7] The 1992 Plan is owed over 1.7 million dollars for per beneficiary premiums as of January 15, 1996, which continue to accrue at a rate of over seventy-three thousand dollars ($73,000) per month. Adventure also apparently failed to pay any pre-funding premiums, which also are included in the Funds' proofs of claim. These premiums accrue at a rate of one hundred twenty-one dollars ($121.00) *times* the number of eligible and potentially eligible 1992 Plan beneficiaries attributable to Adventure. Finally, Adventure has failed to pay any contributions under the applicable NBCWAs since January 1995 and has accrued an estimated four hundred thousand dollars ($400,000) in unpaid contributions since November 1995, which continue to accrue at a rate of over forty-two thousand dollars ($42,000) per month.

There are essentially two types of obligations at issue in this adversary proceeding: (1) monthly per beneficiary premiums owed under the Coal Act; and (2) monthly contributions owed under the applicable NBCWA. The Funds claim all of these obligations are Chapter 11 administrative expenses under various Bankruptcy Code provisions. There are two bases for the Funds' assertion.

First, the Funds assert the premiums accrued and accruing under the Coal Act are administrative expenses[8] because, in the alternative, (1) the premiums are a tax on the Debtors' estates under 11 U.S.C. § 503(b)(1)(B); and (2) the premiums are an actual, necessary expense of the estates under 11 U.S.C. § 503(b)(1)(A). Second, the Funds assert the contributions accrued and accruing under the applicable NBCWA are administrative expenses (1) to the extent they accrued and are accruing post-petition; and (2) to the extent they accrued pre-petition, alternatively, under either 11 U.S.C. § 1113(f), dealing with rejection of collective bargaining agreements in bankruptcy, or 11 U.S.C. § 1114(e), dealing with the treatment of retiree benefits in bankruptcy.[9]

## III. LAW AND ANALYSIS

### A. *The Summary Judgment Standard:*

The well-settled standard governing the disposition of a motion for summary judgment recently was restated by our Court of Appeals:

A moving party is entitled to summary judgment 'if the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

7. Adventure maintained for a good portion of this litigation that it was providing coverage to its retirees through a § 9711 plan. In reality, however, Adventure was merely processing claims through its self-insured plan. It eventually came to light that Adventure had been failing to pay timely its beneficiaries' medical bills and that health care providers were refusing to serve these beneficiaries. The following is an excerpt from an August 1995 letter to the Funds' counsel from the Chief Financial Officer of the Adventure Resources Group:

In regard to your inquiry please be advised that employees, retired and active, which have filed claims under any of the Maben Energy Company-affiliated health care plans have not had any such claims funded after October 6, 1994. All active claims which entered the system after October 7, 1994 remain unpaid.

Ex. 5, letter from David A. Harrah, CPA, to Susan Cannon–Ryan (Aug. 29, 1995). The 1992 Plan stepped in after this cessation of coverage and determined Adventure's beneficiaries were not receiving § 9711 benefits from Adventure. Accordingly, Adventure's beneficiaries were enrolled in the 1992 Plan retroactively to the date coverage from Adventure's purported § 9711 plan ceased. Adventure then was billed for the 1992 Plan premiums.

8. For the uninitiated, administrative expenses are payable by the trustee as a first priority expense under 11 U.S.C. § 507(a)(1).

9. In its complaint, Adventure also challenged the Funds' claim for contingent benefit plan withdrawal liability. As noted by the Funds, however, "separate withdrawals giving rise to such a claim could only occur if the Adventure companies are not alter egos, joint employers or a single employer for purposes of this action ... [and] entry of summary judgment on this issue in favor of the Funds would render the contingent claim moot." Funds Mem. in Supp. of Summ. Jgt. at 2 n. 3; *see also* Funds Reply Mem. at 3 ("The Funds' contingent claim for benefit plan withdrawal liability is ... moot."). Given the Court's favorable ruling for the Funds on the related person/alter ego/joint employer/single employer issue, *supra* note 5, there is no necessity to reach the Funds' contingent claim.

material fact and that the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir.1979).

A genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.* *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, ‒‒ U.S. ‒‒, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994); *see also Carbon Fuel*, 891 F.Supp. at 1188–89.

### B. Joint and Several Liability Under the Coal Act and the Wage Agreements:

■ As an initial matter, the Court notes the Funds devote a substantial portion of its opening brief and exhibits toward establishing the joint and several liability of the Adventure Plaintiffs/counter–Defendants and their other affiliates for the obligations sought in this proceeding. Adventure does not dispute the factual statement in its response and proffers no authority otherwise from the record. Adventure does appear to make a brief policy argument, without citation to supporting authority, seeking to avoid the imposition of joint and several liability. This, of course, is insufficient to contradict the Funds' undisputed and well-supported factual assertions for purposes of *Rule 56, Federal Rules of Civil Procedure*. Accordingly, the Court concludes as a matter of law Plaintiff, each related Plaintiff bankruptcy estate and the non-bankrupt Plaintiffs are jointly and severally liable for the claims asserted by the Funds.

### C. Are the Coal Act Premiums Entitled to Administrative Expense Priority:

■ The Funds assert the premiums accrued and accruing under the Coal Act are administrative expenses because, in the alternative, (1) the premiums are a tax on the Debtors' estates under 11 U.S.C. § 503(b)(1)(B); and/or (2) the premiums are an actual, necessary expense of the estates under 11 U.S.C. § 503(b)(1)(A).

As to the tax argument, the Funds claim all per beneficiary premiums are recognized as post-petition taxes under § 503(b)(1)(B) of the Bankruptcy Code.[10] Adventure appears to concede its Combined Fund premiums are taxes and thus administrative expenses. It argues, however, the 1992 Plan premiums are pre-petition claims and in the nature of excise taxes under 11 U.S.C. § 507(a)(8)(E), thus according them less than first priority status.[11]

---

10. Sections 503(b)(1)(A) and (B) provide in pertinent part as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses ... including—
(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; [and]
(B) any tax—
(i) incurred by the estate, except [an excise tax under 11 U.S.C. § 507(a)(8)(e).]
*Id.*

11. Section 507(a)(8)(E) provides, in pertinent part, as follows:
(a) The following expenses and claims have priority in the following order:
(8) Eighth, allowed unsecured claims of *governmental units*, only to the extent that such claims are for—
(E) an excise tax on—
(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or
(ii) if a return is not required, *a transaction* occurring during the three years immediate-

The seminal case, and one of the very few cases anywhere, addressing the classification and priority of Coal Act claims is *In re Chateaugay Corp.*, 53 F.3d 478, 486 (2d Cir. 1995). In *Chateaugay*, LTV Steel Company, Inc. and several subsidiaries appealed a judgment of the district court holding that LTV's obligations under the Coal Act were incurred taxes for purposes of § 503(b)(1)(B) and thus entitled to administrative priority under § 507(a)(1). LTV, along with over fifty subsidiaries and affiliates, filed for protection under Chapter 11 on July 17, 1986. The Coal Act was enacted on October 24, 1992 and became effective February 1, 1993. Signing Stmt. of President George Bush attached to the Energy Policy Act of 1992, *reprinted in* 1992 U.S.C.C.A.N.1953, 2534–1 at 3; *In re Chateaugay*, 53 F.3d at 487. The district court in *Chateaugay* held the assessments accruing during the bankruptcy period under the Coal Act were in the nature of a tax and therefore entitled to administrative priority treatment.

■ The Second Circuit concluded the critical issue was whether the premiums assessed under the Coal Act were in the nature of a "claim" pre-existing the Chapter 11 petition which would, of course, have to be "disallowed." *Id.* at 496. A "claim," for purposes of the Bankruptcy Code, is defined in 11 U.S.C. § 101(5) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." *Id.* As noted in *Chateaugay,* "'Congress unquestionably expected

this definition to have wide scope.'... [and intended] to invest the term 'claim' with the 'broadest possible' scope so that 'all legal obligations of the debtor ... will be able to be dealt with in a bankruptcy case.' " *Id.* at 496–97 (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir.1991); *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990); and H.R.Rep. No 95–595, at 310 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6267).[12] Nevertheless, the term does not have "infinite" reach. *In re Chateaugay*, 53 F.3d at 497. The court in *In re Chateaugay* determined no right to payment existed at the time of LTV's petition because, *inter alia,* no conceivable "right to payment ... existed until the enactment of the Coal Act six years after the filing of LTV's petition." *Id.* at 497. The court went on to hold "the portion of LTV's Coal Act liability accruing during the pendency of its bankruptcy is entitled to treatment as an administrative expense of the estate pursuant to section 507(a)(1)." [13] *Id.* at 498.

Adventure would have the issue framed similarly to the analysis in *In re Chateaugay, i.e.,* whether the enactment of the Coal Act in October 1992 (predating the Chapter 11 petition by a couple of months) operates to give the Funds a lower priority or extinguishable pre-petition right to payment of per beneficiary premiums under the 1992 Plan.[14]

The analysis undertaken by the court in *In re Chateaugay* is, of course, not binding on this Court. Were the Court to apply the

---

ly preceding the date of the filing of the petition;

*Id.* (emphasis added).

**12.** Our Court of Appeals has similarly construed "claim" in sweeping fashion. *See In re Carolina Motor Express, Inc.*, 949 F.2d 107, 111 n. 4 (4th Cir.1991), *rev'd on other grounds sub nom. Reiter v. Cooper*, 504 U.S. 907, 112 S.Ct. 1934, 118 L.Ed.2d 541 (1993).

**13.** Adventure also appears to argue the contribution obligations under the Coal Act are not taxes within the meaning of § 503(b)(1)(B). This argument clearly is without merit. *In re Chateaugay,* 53 F.3d at 498.

**14.** There is one general fallacy surfacing throughout Adventure's argument which bears correction. Adventure seems to suggest their

obligations are controlled not by the Coal Act, but rather by the prior NBCWAs to which Adventure was signatory. This clearly is not the law in this judicial district. *In re Chateaugay,* 53 F.3d at 497 (stating "The obligations here at issue are exclusively statutory in origin and cannot be considered a 'pay-back' for pre-petition labor.... LTV's liability to the Combined Fund is newly imposed by the Coal Act, not a revival of old contractual obligations."); *Carbon Fuel,* 891 F.Supp. at 1198 (stating "The parties' contractual obligations entered prior to the enactment of the Coal Act are not continued under the Act. The private provisions required by the applicable NBCWAs do not survive, nor are they codified, ratified, confirmed, or renewed.")

right-to-payment analysis arising from *In re Chateaugay,* however, it would conclude the "obligations" contained in the Act at the time of the petition were simply too removed and attenuated to constitute a pre-petition right to payment. As noted, the Act did not become effective until February 1993.

■ The Court concludes it is more appropriate to make the straightforward determination of whether the obligations at issue here were "incurred by the estate" pursuant to § 503(b)(1)(B).[15] If so, they fall squarely within that section, and are thus entitled to administrative priority status without reference to § 101(5)(A). If the Court can determine the 1992 Plan per beneficiary premiums were incurred by the estate, it also would determine "necessarily" the premiums were post-petition because "there can be no bankruptcy estate until the petition in bankruptcy is filed." *United States v. Friendship College, Inc.,* 737 F.2d 430, 431 (4th Cir.1984).

■ The Bankruptcy Code does not delineate precisely when a tax obligation is "incurred" for purposes of § 503(b)(1)(B). The United States Court of Appeals for the Sixth Circuit, however, recently adopted the appropriate construction of the term. *In re Columbia Gas Trans. Corp.,* 37 F.3d 982 (6th Cir.1994), *cert. denied sub nom. West Virginia State Dep't of Tax & Rev. v. Internal Rev. Serv.,* —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). The court observed: "a tax liability is generally 'incurred on the date it accrues, not on the date of the assessment or the date on which it is payable.'" *Id.* at 985; *see also* 2 William L. Norton, Jr. *et al., Norton Bankruptcy Law and Practice 2d* § 42.19 (1994) ("The tax is usually deemed to be incurred at one of two times: the date of assessment of the tax or the date of accrual of the tax.") In common parlance, accrual occurs when an obligation "come[s] into existence as an enforceable claim." *Webster's Third New International Dictionary* 13.

■ The 1992 Plan per beneficiary premiums come due based on a premium rate set by the Trustees of the 1992 Plan multiplied by the number of beneficiaries attributable to the former employer who are then receiving benefits from the 1992 Plan. 26 U.S.C. §§ 9712(d)(2)(A), 9712(d)(1)(B) and 9701(c)(4). So long as an employer provides benefits for these retirees directly through the employer's own plan, as required under 26 U.S.C. § 9711, the beneficiaries are not enrolled in the 1992 Plan. This means the employer has no 1992 Plan beneficiaries attributed to it and the Funds have no enforceable claim for per beneficiary premiums. When Adventure ceased the maintenance of its § 9711 plan in 1994, however, there arose

---

15. Section 503(b)(1)(B) does not accord administrative expense status to "a tax of a kind specified in section 507(a)(8)," *i.e.,* an excise tax, regardless of when it is incurred. Accordingly, the Court must address whether the premiums here constitute such a tax. Adventure half-heartedly asserts the 1992 Plan per beneficiary premiums are in the nature of a pre-petition excise tax under § 507(a)(8)(E)(ii), and thus outside the reach of § 503(b)(1)(B). While the Court is aware of contrary authority, it cannot conclude the premium obligations here are excise taxes. Section 507(a)(8)(E)(ii) provides that such a tax is levied on "a *transaction* occurring during the three years immediately preceding the date of the filing of the petition." While it is possible to identify conceptually a transactional component which might support imposition of the 1992 Plan per beneficiary premiums, *see In re Rauer,* Bk. No. 95–20332, slip op. at 5, that analysis appears to stretch the limits of the section. If the remaining requirements of § 507(a)(8) were present in this case, however, it is conceivable under circuit precedent Adventure might be able to identify the necessary transactional component for application of § 507(a)(8)(E). *Cf. New Neighborhoods v. West Virginia Workers' Comp. Fund,* 886 F.2d 714, 719 (4th Cir.1989) (holding premiums due the West Virginia Workers' Compensation Fund were excise taxes under § 507, in part, because "[t]he obligation imposed upon employers by the West Virginia statute is imposed upon employers as a class and liability arises *through the transaction or act of employing.*") (emphasis added). The remaining requirements of § 507(a)(8) are clearly not satisfied though. Section 507(a)(8) requires the collecting authority to be a "governmental unit." Adventure itself forcefully (and curiously) argues against the Funds' governmental unit status, and the Court concurs in that analysis. *See* Pls.' Resp. at 14 (stating "the Coal Act § 9712(a)(1) clearly establishes the 1992 UMWA Benefit Plan as a private plan, not a 'governmental unit' as defined under Section 101(27) of the Code.") Accordingly, the 1992 Plan per beneficiary premiums cannot be excise taxes under § 507(a)(8)(E).

in the Funds "an enforceable claim" for per beneficiary premiums and the premiums thus accrued on that date.

The Court therefore concludes Adventure incurred the tax obligations due the Funds after the filing of the Chapter 11 petition. Accordingly, the per beneficiary premiums for the 1992 Plan are post-petition taxes under § 503(b)(1)(B) and entitled to first priority treatment under § 507(a)(1).[16] The Funds' motion for partial summary judgment on this issue is **GRANTED**.[17]

16. While not specifically challenged, the same result would appear to apply with respect to the Combined Fund premiums. Prior to February 1, 1993 the Funds did not have an enforceable claim against any operator to pay Combined Fund premiums. 26 U.S.C. §§ 9702(c), 9704(a).

17. Adventure apparently does not challenge the treatment of prefunding premiums required under § 9712(d)(1)(A) as administrative taxes. *See* Pls.' Resp. at 2. The Funds also have a persuasive argument that the Coal Act premiums are an actual, necessary expense of the estates under 11 U.S.C. § 503(b)(1)(A). Given the disposition under § 503(b)(1)(B), however, the Court need not address this argument.

18. Adventure does not dispute the NBCWA contributions which came due post-petition are entitled to administrative expense priority.

In addition to its § 1114(e) argument, the Funds also assert the NBCWA contributions are entitled to administrative expense status under 11 U.S.C. § 1113(f). A good and very recent general discussion of § 1113 can be found in *In re Lady H Coal Company*, 193 B.R. 233 (Bankr. S.D.W.Va.1996). Section 1113(f) provides as follows:

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

*Id.* The Funds rely heavily on the decision in *In re Unimet Corp.*, 842 F.2d 879 (6th Cir.), *cert. denied sub nom. Unimet Corp. v. United Steelworkers of America*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988), which essentially interpreted § 1113(f) to provide a superpriority for the payment of retiree benefits. *Id.* at 884. The Court declines to apply § 1113(f) in similar fashion to the retiree obligations in question here. The holding in *Unimet* was subsequently codified by Congress in § 1114. *In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 408 (2d Cir.1994) (stating "That Congress was compelled to act suggests that the protection it provided in section 1114 was not already compelled by section 1113.") The decision in *In re Ionosphere Clubs, Inc.*, 134

## D. Are Adventure's Due and Owing Pre-Petition Contributions For Retirees Under the Applicable NBCWAs Entitled to Administrative Expense Priority Under 11 U.S.C. § 1114(e):

■ The Funds next assert the pre-petition contributions due under the applicable NBCWAs are entitled to administrative expense status under 11 U.S.C. § 1114(e).[18] Adventure disagrees, asserting § 1114 was enacted only to protect retiree benefits post-petition. A brief examination of the history of § 1114 is in order.[19]

B.R. 515 (Bankr.S.D.N.Y.1991) clarifies the respective scopes of § 1113 and § 1114:

§ 1114 is the *exclusive provision* relating to the modification or termination of retiree benefits. § 1114 specifically and unequivocally addresses retiree issues that are otherwise generally covered by § 1113.

*Id.* at 519 (emphasis added). There is significant evidence of Congressional intent supporting the exclusivity analysis of *Ionosphere*. Rather than adopting a new comprehensive provision dealing with retiree benefits, congressional bills predating § 1114 sought merely to amend § 1113 to make clear that its requirements regarding termination or alteration of the provisions of a collective bargaining agreement included any provision relating to benefits for retirees. *See, e.g.,* H.R. 5490, 99th Cong., 2d Sess., 132 Cong. Rec. H6507 (daily ed. Sept. 9, 1986). Congress ultimately rejected this approach. Based on the authority discussed above, the Court concludes the Funds' administrative expense argument for contributions in the nature of retiree benefits is controlled by § 1114. Section 1113 is not implicated.

To the extent administrative expense status is sought for contributions not in the nature of retiree benefit obligations, and with an awareness of contrary authority, the Court concludes § 1113(f) does not assist the Funds. Section 1113 simply does not address the priority in bankruptcy of obligations under a collective bargaining agreement.

19. The formal legislative history of § 1114 is limited to the somewhat sketchy Senate Report on Senate Bill 548. *See* S.Rep. No. 119, 100th Cong., 1st Sess., *reprinted in* 1988 U.S.C.C.A.N. 683. The Court, however, has located a thorough analysis by a senior attorney at the Federal Deposit Insurance Corporation, discussing at length the legislative process that led to the enactment of § 1114. Andrea J. Winkler, *Legislative History of the Retiree Benefits Bankruptcy Protection Act of 1988, reprinted in* App. 1 Lawrence P. King *et al., Collier on Bankruptcy,* Part XIX (15th ed. 1995). Also helpful on the background of § 1114 is Susan J. Stabile, *Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code,* 14 Cardozo L.Rev.1911 (1993).

In the mid–1980s, the fortunes of the steel industry sank dramatically. This resulted in the closure of numerous steel production facilities followed inevitably by Chapter 11 filings. Despite the presence of § 1113, many Chapter 11 debtors ceased payments for retiree benefits, arguing the Bankruptcy Code did not permit such post-petition payments. The impetus for Congressional action was the Chapter 11 filing of LTV Corporation on July 17, 1986. LTV promptly suspended retirement benefit payments to over 78,000 former employees when it filed for bankruptcy protection.

Illustrating the urgency of the situation, the Senate completed enactment of a remedial measure just 13 days after LTV's suspension of payments requiring LTV and its subsidiaries to continue paying all medical and life insurance benefits to retirees. *See* 132 Cong.Rec. S9882 (daily ed. July 30, 1986). Following a series of stopgap measures over the course of the next two years, President Reagan signed the Retiree Benefits Bankruptcy Protection Act, thus putting § 1114 into effect.

Section 1114(e) provides as follows:

(e)(1) Notwithstanding any other provision of this title, the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section 'trustee' shall include a debtor in possession), shall timely pay and shall not modify any retiree benefits, except that—

(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,

after which such benefits as modified shall continue to be paid by the trustee.

(2) Any payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense as provided in section 503 of this title.

*Id.*[20]

The Court cannot simply presume Congress intended to accord high priority status to pre-petition retiree benefit claims because of the general importance of such benefits or the seeming unfairness of a decision otherwise. Rather, in the absence of specific direction, the Court must be guided by a general thesis underlying the Bankruptcy Code:

'One of the central themes of the Bankruptcy Code is equality of distribution. [In] *In re Mammoth Mart*, 536 F.2d 950 ([1st Cir.] 1976), the Court held "if one claimant is to be preferred over others, the purpose should be clear from the statute. To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution, it dilutes the value of the priority for those creditors Congress intended to prefer."'

*In Re Rayman, Martin & Fader, Inc.*, 170 B.R. 286, 290 (D.Md.1994) (quoted authority omitted).

Aside from this general principle, there are specific indications Congress sought only to accord priority status to post-petition retiree benefits. While there is little reasoned case law on point, the commentator perhaps most familiar with the legislative history surrounding § 1114 has surmised as much. *See* Winkler, *Legislative History of the Retiree Benefits Bankruptcy Protection Act of 1988*, 1 *reprinted in* App. 1 Lawrence P. King *et al., Collier on Bankruptcy*, Part XIX, 1894 (15th ed.1995) (stating § 1114 "provided that

---

**20.** Several courts have bemoaned the arduous task of interpreting § 1114. The following excerpt from a recent decision of the United States Court of Appeals for the Second Circuit is indicative:

> As our exhaustive experience with RICO has taught us, a statute which at first glance appears to be 'plain on its face,' may require substantial judicial interpretation. Section 1114 turned out to be such a statute.

*In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 68 (2d Cir.1996) (citations omitted); *see also In re Ionosphere Clubs*, 134 B.R. at 517 (stating "[§ 1114] has spawned diverse and sometimes inconsistent interpretations and theories as to the substantive and procedural standards necessary for modification of retiree benefits. Expressed colloquially, these interpretations are all over the lot. Some are well reasoned, some conclusory with limited analysis.").

retiree benefits *paid during the pendency of the case* have the status of allowed administrative expenses") (emphasis added). A leading bankruptcy commentator concurs. *See* 4 William L. Norton, Jr. *et al., Norton Bankruptcy Law & Practice 2d* § 84:10 (1995) (stating "Section 1114(e)(2) grants administrative expense priority status to benefits payments *accruing post-petition* up to the reorganization plan confirmation date. Effectively, this means that any retiree insurance benefits coming due *between the filing of the petition and the confirmation date* are subordinate only to the claims of secured creditors.") (emphasis added).

▪ It is clear the purpose of § 1114 was to remedy the harm caused by debtors such as LTV who suspend retiree benefits *following* the filing of a Chapter 11 petition. The Court is not inclined to extend the reach of § 1114 further without explicit Congressional direction. Accordingly, the Court will not accord administrative priority status to Adventure's pre-petition contributions due under the applicable NBCWAs. The Funds' motion for partial summary judgment on this issue is **DENIED.**

## IV. CONCLUSION

Based on the foregoing analysis, the Court **GRANTS** in part and **DENIES** in part the Funds' motion for partial summary judgment. Administrative expense status will be accorded the Funds' claims as discussed herein. Each bankruptcy estate and the non-bankrupt Plaintiffs are jointly and severally liable for the claims asserted. The Court leaves the determination of the appropriate allowable amount of the claims to the Bankruptcy Court, pending the receipt of updated information from the Funds. With relief, this case is DISMISSED from the Court's docket.